LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.
Hadjar Anahita Ohadi (SBN 358387)
9800 Wilshire Blvd
Beverly Hills, CA 90212
Email: aohadi@rcornishlaw.com
Tel: (213) 871-7788

*Attorneys for Plaintiff Kenneth Hu*
*a/k/a Yangming Hu*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| KENNETH HU a/k/a Yangming Hu,<br><br>Plaintiff,<br><br>v.<br><br>LAWRENCEBURG NOODLES LLC, a Wyoming limited liability company; SARABJIT SINGH, an individual; ARIBA HOLDING LLC, a California limited liability company; MINJIE HE, an individual; SHARIQ MIRZA, an individual; and DHARMESH PATEL, an individual,<br><br>Defendants. | Case No. 4:26-cv-08482<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kenneth Hu a/k/a Yangming Hu ("Plaintiff"), by and through his undersigned attorneys, brings this Complaint against Defendants Lawrenceburg Noodles LLC (the "Lawrenceburg Noodles" or the "Company"), Sarabjit Singh, Ariba Holding LLC ("Ariba"), Minjie He, Shariq Mirza, and Dharmesh Patel (collectively, "Defendants"), and alleges as follows.

## INTRODUCTION

1. This is an investment fraud action. Defendants induced Plaintiff, a Chinese national seeking lawful permanent residency through the EB-5 Immigrant Investor Program, to make an $800,000 capital investment and, upon information and belief, pay an $80,000 "subscription fee" for an interest in a Noodles & Company franchise restaurant purportedly developing in

Lawrenceburg, Tennessee. But there was no franchise: the franchise agreement Defendants used to sell the investment was a fabrication bearing forged signatures of Noodles & Company executives—indeed, Noodles & Company has stated in writing that it did not authorize or execute any agreement with Defendants.

2. The rest of the venture was equally hollow. Upon information and belief, Lawrenceburg Noodles, the entity formed to receive Plaintiff's capital, never remodeled a building, purchased equipment, obtained permits, hired restaurant staff, or served a customer. Its bank records show Plaintiff's funds sitting idle in an account whose only meaningful outflows were monthly rent payments creating the illusion of business activity. Its 2023 federal tax return reported zero income, zero expenses, and zero assets. Within months of receiving Plaintiff's money, Defendants allowed the Lawrenceburg Noodles to be administratively dissolved, and Ariba—the entity that, upon information and belief, collected the $80,000 fee—cancelled its own existence.

3. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages of not less than $880,000, together with the lost opportunity to deploy those funds in a legitimate EB-5 investment and the resulting harm to his immigration prospects.

4. Plaintiff brings claims for common law fraud, breach of fiduciary duty, negligent misrepresentation, negligence, rescission under Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), common law rescission, violation of the California Corporate Securities Law of 1968, Cal. Corp. Code §§ 25401, 25501, and civil RICO under 18 U.S.C. § 1962.

## PARTIES

5. Plaintiff is a citizen and national of the People's Republic of China, domiciled in the state of New Jersey. He is not admitted for permanent residence in the United States.

6. Defendant Lawrenceburg Noodles LLC is a Wyoming limited liability company, registered agent at 30 N. Gould St., Ste. N, Sheridan, Wyoming 82801, formed to develop and operate a Noodles & Company restaurant at 2124 N. Locust Ave., Lawrenceburg, Tennessee 38464. The Wyoming Secretary of State administratively dissolved the Company on August 9, 2024 for tax delinquency.

7. Defendant Sarabjit Singh ("Singh") is a United States citizen residing, upon information and belief, in or around Tracy, California. Singh organized the Company and is its sole member, as reflected in the IRS notice assigning the Company's EIN. He signed the Subscription Agreement as the Company's CEO and the Loan Agreement both as CEO and as individual borrower. Upon information and belief, Singh is associated with Singh Foods, which operates numerous legitimate Noodles & Company franchise locations in California.

8. Defendant Ariba Holding LLC is a California limited liability company, Entity No. 201829010457, with its principal office at 3900 Newpark Mall Road, Suite 203, Newark, California 94560. Ariba served as the Company's exclusive agent for marketing and selling membership interests to foreign investors and, upon information and belief, collected $80,000 from Plaintiff for purported investment and immigration services. Ariba filed a Certificate of Cancellation with the California Secretary of State on January 6, 2025.

9. Defendant Minjie He ("He") is, upon information and belief, a resident of Newark, California. At all relevant times, He served as Ariba's CEO and sole Manager, controlled its financial and corporate affairs, and is a controlling person of Ariba within the meaning of applicable securities laws. He communicated directly with Plaintiff regarding the $80,000 fee and the purported EB-5 benefits of the investment.

10. Defendant Shariq Mirza ("Mirza"), also known as "Rick," is a United States citizen residing in Hayward, California. Upon information and belief, Mirza acted as an agent, promoter, and facilitator of the investment, solicited Plaintiff using the email address rick@daulatt.com, had access to the Company's bank account, and participated in decisions regarding the deployment of investor capital.

11. Defendant Dharmesh Patel ("Patel") is, upon information and belief, a resident of Cumming, Georgia. Patel signed the fraudulent Franchise Agreement as "Operator" of the purported Lawrenceburg restaurant on December 13, 2023, and, upon information and belief, participated in the preparation of that document and the solicitation of Plaintiff's investment.

12. Defendants acted in concert. Each is liable for the acts of the others by reason of their joint participation in the conduct alleged herein and under the doctrines of agency, respondeat

superior, alter ego, and aiding and abetting. Each Defendant knew of, participated in, and profited from the scheme.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), and civil RICO, 18 U.S.C. § 1962, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). The Court independently has jurisdiction under 28 U.S.C. § 1332(a)(2): Plaintiff is a citizen of a foreign state, each Defendant is a citizen of a State (and, upon information and belief, no member of any Defendant LLC is a foreign citizen or subject), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District: Defendant Ariba Holding LLC's principal office is located at 3900 Newpark Mall Road, Suite 203, Newark, California, within this District; Defendants Minjie He and Shariq Mirza reside in Newark and Hayward, California, respectively, both within this District; the Subscription Agreement directed Plaintiff to wire his $800,000 investment to a Company account at Bank of the Orient in San Francisco, within this District; and, upon information and belief, Plaintiff's $80,000 fee to Ariba was wired to Ariba's East West Bank account. This District is where the Enterprise's financial architecture was centered and where the solicitation and fraudulent inducement of Plaintiff's investment were substantially carried out. Venue also lies under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because acts and transactions constituting the violations—the solicitation of Plaintiff's investment, the collection of the Ariba fee, and the direction of investor funds to California bank accounts—occurred in or were directed at this District. Assignment to the Oakland Division is proper under Civil Local Rule 3-2(d) because a substantial part of the events giving rise to this action arose in Alameda County, California, where Ariba's principal office and Defendants He's and Mirza's residences are located.

15. This Court has personal jurisdiction over all Defendants on independent bases. First, this Court has general jurisdiction over Defendants Singh, Ariba, He, and Mirza because

each is "at home" in California: Singh, He, and Mirza are domiciled in California, and Ariba is a California limited liability company with its principal office in California. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (holding that a corporation is ordinarily subject to general personal jurisdiction only where it is "at home," principally its place of incorporation and principal place of business); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (holding that general jurisdiction permits adjudication of any claim only when a corporation is essentially at home in the forum, whereas specific jurisdiction extends only to claims arising from or connected to the defendant's forum-related conduct). California's long-arm statute, Cal. Civ. Proc. Code § 410.10, extends to the limits of the Constitution. Second, this Court has specific jurisdiction over all Defendants because Defendants purposefully directed their scheme at California: they designated California bank accounts to receive Plaintiff's investment and fee payments, and the collection of the $80,000 fee and the solicitation of Plaintiff were centered in California. *See Calder v. Jones*, 465 U.S. 783, 788 (1984) (holding that personal jurisdiction is proper when the defendant has minimum contacts with the forum and the litigation such that exercising jurisdiction comports with fair play and substantial justice); *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Third, Section 27 of the Exchange Act provides an additional and independent basis for personal jurisdiction over Defendants. Federal Rule of Civil Procedure 4(k)(1)(C) provides that service of a summons establishes personal jurisdiction when authorized by a federal statute, and Section 27 authorizes nationwide service of process in actions enforcing liabilities or duties created by the Exchange Act. 15 U.S.C. § 78aa(a). Accordingly, the relevant due-process inquiry considers each Defendant's contacts with the United States as a whole rather than with California alone. Because each Defendant is a United States resident or domestic entity, each has sufficient contacts with the United States to support personal jurisdiction under Section 27.

16. Each Defendant individually directed conduct at California: Singh, a California resident, organized and controlled the Company and directed Plaintiff to wire his investment to a California bank account; Ariba, a California limited liability company, and its CEO He, a California resident, collected the $80,000 fee through a California bank account; Mirza, a

California resident, solicited Plaintiff and communicated the alleged misrepresentations to him; and, upon information and belief, Patel knowingly participated in and profited from an enterprise whose financial architecture and central actors were located in California.

## FACTUAL ALLEGATIONS

### A. The EB-5 Program and Plaintiff

17. The EB-5 Immigrant Investor Program, 8 U.S.C. § 1153(b)(5), allows foreign nationals to obtain conditional permanent residency by investing in a new commercial enterprise that creates at least ten full-time U.S. jobs. The program has become a target for fraudulent operators who exploit foreign investors' desire for U.S. residency through sham investment vehicles, fabricated business plans, and misappropriated capital. Plaintiff, a Chinese national unfamiliar with American business practices and dependent on the representations of the investment's promoters, was precisely such a target.

### B. The Offering Documents

18. Singh organized the Company as a Wyoming limited liability company on or about June 7, 2023. On or about August 9, 2023, Defendants caused the preparation and execution of three interlocking agreements designed to create the appearance of a legitimate EB-5 investment: a Subscription Agreement between the Company and Plaintiff; a Loan Agreement among the Company, Singh as individual borrower, and Plaintiff; and a Fee Agreement between Ariba and Plaintiff (together with Defendants' related oral representations, the "Offering Documents").

19. The Subscription Agreement, signed by Singh as CEO, offered membership interests in the Company for a maximum of $28,000,000 and a minimum of $800,000, structured to qualify subscribers for EB-5 benefits, with subscribers to own seventy-five percent of the Company in the aggregate. It directed Plaintiff to wire his $800,000 investment to a Company account at Bank of the Orient in San Francisco.

20. The Loan Agreement, signed by Singh as CEO and individually as borrower, provided for an $800,000 loan from Plaintiff to the Company maturing sixty months from the Initial Funding Date, and contained the following material commitments:

(a) the Company would use the loan proceeds "solely for the purpose of

funding, or reimbursing expenses previously paid or incurred for, the Project" (§ 2.1);

(b) the funds "will not be utilized before the Lender receives Form I-797C (Notice of Action)" from USCIS (§ 2.3);

(c) the Company would provide Plaintiff monthly bank statements by the 15th of each following month (§ 4.1(a));

(d) the Company would document that not less than $800,000 was spent on the Project (§ 5.1(f)); and

(e) if the Company failed to create ten direct full-time jobs within twenty-four months of initial funding, it would refund the $800,000 plus a $100,000 job-creation failure penalty, and would refund the $800,000 within ninety days if Plaintiff's I-526 Petition were denied (§ 7.2(f)). The Loan Agreement is governed by Wyoming law (§ 8.11), and the breach of fiduciary duty claim and the rescission of the Loan Agreement are accordingly pleaded under Wyoming law, while Plaintiff's remaining state law claims are pleaded under California law given that Defendants' tortious conduct and the scheme's financial architecture were centered in this District.

21. The Fee Agreement required Plaintiff to pay Ariba $80,000 in exchange for Ariba's services in "completing [the] Investment and obtaining the desired immigration benefit (i.e. EB-5 green card)," including providing the franchise agreement, subscription agreement, business plan, and other project documents, assisting with the subscription, and keeping Plaintiff "fully informed of all developments concerning the Investment and the Immigration Filing."

22. Upon information and belief, Defendants transmitted or caused transaction documents to be transmitted to Plaintiff's family in the People's Republic of China through the international mails. The attorney services agreement and the project agreement were mailed to Plaintiff's mother, Quanmei Zhang, in China, where she received them on or about December 20, 2023. Ms. Zhang executed the documents, and on or about December 22, 2023, Transition Overseas, an immigration consulting company located in Shanghai, China, that acted as an agent and intermediary in soliciting Plaintiff's investment and whose principal is known to Plaintiff as "Peter," placed the executed documents in the mails for delivery to the United States. Upon

information and belief, Defendants directed, arranged for, or reasonably foresaw these mailings, which were incident to an essential part of the scheme because they were necessary to obtain execution of the transaction documents and to induce the transfer of Plaintiff's capital.

**C. The Forged Franchise Agreement**

23. On or about December 12–13, 2023, Defendants caused the preparation and execution of a purported Franchise Agreement between Noodles & Company and the Company. The document stated that Noodles & Company granted the Company the right to operate a Noodles & Company restaurant at 2124 N. Locust Ave., Lawrenceburg, Tennessee for a term of twenty years. It bore the purported signatures of Noodles & Company personnel John Ramsay ("New Franchise Sales") and Lonnie Ahlfinger ("Franchise Director"), and was signed by Singh as "Owner" and Patel as "Operator."

24. The Franchise Agreement was a sophisticated fabrication. Running more than fifty pages, it replicated the format, structure, and language of genuine Noodles & Company franchise agreements—complete with provisions on site approval, remodeling, training, fees, and trademarks, and an Authentisign electronic signature ID—all designed to give the document the appearance of legitimacy and to induce reliance by investors such as Plaintiff.

25. Noodles & Company has unequivocally disavowed the document. In a March 28, 2025 email, Noodles & Company Vice President of Legal Cheryl Lucente stated that Noodles & Company "did not authorize or execute this agreement or any other agreement with such entity or individual(s)." The email further stated that Lucente's response followed a message forwarded to her by Noodles & Company COO Joe Christina.

**D. The Lease**

26. On or about February 22, 2024, Singh entered into a Lease Agreement on the Company's behalf with ILC, Inc., a Tennessee corporation, for the premises at 2124 N. Locust Ave. The lease provided for fixed minimum rent of $8,913.24 per month with escalations, a security deposit and prepaid rent of $17,826.48, and use of the premises "solely for the operation of a Franchised Restaurant" under the Noodles & Company system. Defendants did not disclose that ILC, Inc. had been administratively dissolved and reinstated multiple times between 1999 and

2016.

**E. Plaintiff's Payments**

27. On or about February 26, 2024, Defendants provided Plaintiff with new wire instructions directing him to remit his investment to a Company account at PNC Bank—not the Bank of the Orient account specified in the Subscription Agreement—with the remittance noted as "subscription fee." The change was made without any amendment to the Subscription Agreement and, upon information and belief, was designed to direct Plaintiff's funds into an account over which Defendants exercised exclusive and unmonitored control.

28. On or about February 27, 2024, Plaintiff wired $800,050.00 from his personal savings account to the Company's PNC account. The wire posted on March 4, 2024, raising the account balance from $143,823.00 to $943,873.00. Separately, upon information and belief, Plaintiff paid Ariba the $80,000 fee by wire to its East West Bank account, as the Fee Agreement directed.

**F. What Happened to the Money**

29. The Company's bank records reveal financial activity wholly inconsistent with developing a restaurant—and entirely consistent with a shell created to receive and hold Plaintiff's funds. In January 2024, the Company's account at JPMorgan Chase had a beginning and ending balance of $0.00 and zero transactions. On February 12, 2024—sixteen days before Plaintiff's wire—a $200,000 transfer from "SINGH BROS" raised the Company's PNC balance from $100.00 to $200,100.00, evidently to create the appearance of activity in an otherwise dormant account. On February 28, 2024, the Company paid $35,000.00 to "Noodles & Company" as a "Franchise Fee" and $21,222.00 to ILC, Inc. for the lease deposit and rent, leaving $143,878.00.

30. After Plaintiff's $800,050.00 arrived on March 4, 2024, the account received no further deposits of any kind. The only outflows were monthly lease payments of $10,611.00 (March 27, April 28, and May 29, 2024), minimal ADP payroll runs and fees in May 2024 totaling under $7,000, and minor corporate filing charges, leaving a May 31, 2024 balance of $904,636.80. Nothing was spent on remodeling, equipment, inventory, permits, insurance, or any other cost of developing or operating a restaurant. The recurring rent payments—made without any

corresponding development activity—served only to drain Plaintiff's funds while sustaining the illusion of a real project.

31. The Company's 2023 IRS Form 1065 reports zero income, zero expenses, zero assets, and zero partners' capital, while the Schedule K-1 issued to Plaintiff reflects a 75% profit, loss, and capital interest, with Singh holding 25%. The zero-across-the-board return is consistent with a shell entity never intended to operate as a going concern.

32. Upon information and belief, no Noodles & Company restaurant was ever developed, opened, or operated at the Lawrenceburg location or anywhere else in connection with the Company. No remodeling permits were obtained, no equipment purchased, no suppliers contracted, no staff hired beyond minimal payroll processing, no inspections conducted, and no revenue generated. The entire "Project" was a fiction designed to extract Plaintiff's $800,000 capital investment, wired as $800,050.00, and, upon information and belief, the $80,000 Ariba fee.

**G. False Representations and Omissions**

33. The Offering Documents, which each Defendant reviewed, approved, and distributed or caused to be distributed to Plaintiff, contained material misrepresentations on which Plaintiff relied: (a) that the Company held a valid twenty-year Noodles & Company franchise—false, because Noodles & Company never authorized or executed any agreement with Defendants; (b) that Plaintiff's capital would be used solely to fund a viable restaurant project—false, because Defendants never intended to build or operate a restaurant and had no genuine business plan; (c) that the Company would create ten full-time jobs within twenty-four months and would refund Plaintiff's investment plus a $100,000 penalty if it failed—false, because Defendants never intended to create any jobs and had no capacity to do so; and (d) that the Company would safeguard Plaintiff's funds pending USCIS action, provide monthly bank statements, and document Project expenditures—commitments Defendants disregarded from the outset, depriving Plaintiff of the information that would have revealed the fraud.

34. Defendants also failed to disclose material facts they had a duty to disclose, including: that the Company had no operating history, no revenue, no assets, and a bank account that sat at zero as recently as January 2024; that the only pre-investment deposit was the $200,000

Singh Bros transfer staged sixteen days before Plaintiff's wire; that ILC, Inc., the landlord, had a troubled corporate history of repeated administrative dissolutions; and that, upon information and belief, Noodles & Company itself had publicly reported recurring net losses, restaurant closures, and asset impairments in its SEC filings—facts material to a venture whose viability depended entirely on a Noodles & Company franchise.

35. Upon information and belief, to bolster the scheme's appearance of legitimacy, Defendants also represented that the investment was secured by collateral, including real property at 3675 S. George Washington Blvd., Yuba City, California, supplying Plaintiff a grant deed and land evaluation for the property. Upon information and belief, the property was not genuine collateral, and Defendants had neither the authority nor the intention to encumber it for Plaintiff's benefit. Upon information and belief, Defendants likewise provided Plaintiff with a filed copy of a Statement of Information of Singh Foods Inc. to trade on Singh's association with legitimate franchise operations.

**H. Scienter**

36. Singh knew the Franchise Agreement was fraudulent. Upon information and belief, through Singh Foods, Singh operates numerous genuine Noodles & Company franchises and therefore knew how authentic franchise agreements are obtained and authorized. His familiarity with the legitimate process makes his participation in the fabrication deliberate fraud, not inadvertence. Patel signed the forged document as "Operator," demonstrating his knowledge of and participation in the scheme. Upon information and belief, Mirza and He served as the points of contact between Defendants and Plaintiff throughout the solicitation—Mirza regarding the purported franchise, investment terms, and EB-5 benefits; He regarding the $80,000 fee—and each knew or recklessly disregarded that the representations made to Plaintiff were false.

37. Defendants' motive, opportunity, and pattern of conduct confirm scienter. Defendants obtained Plaintiff's $800,000 capital investment, wired as $800,050.00, and, upon information and belief, the $80,000 Ariba fee, and made no revenue-generating expenditure afterward. The scheme's sophistication—a fifty-plus page counterfeit franchise agreement, three interlocking contracts, shell entities in Wyoming and California, and the exploitation of legitimate

Noodles & Company branding—evidences premeditation. And both entities were promptly disposed of after the fraud: the Company was administratively dissolved on August 9, 2024, and Ariba cancelled its existence on January 6, 2025, a pattern consistent with the intentional destruction of the corporate vehicles used to perpetrate the fraud.

**I. The Enterprise and Use of Interstate Wires and Mails**

38. Defendants together constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), associated for the common purpose of soliciting capital from foreign nationals through fabricated franchise documents and the exploitation of the EB-5 Program, and diverting that capital to Defendants' own use. Each member performed a distinct role: Singh as organizer, CEO, and "Owner"; Patel as designated "Operator"; Mirza and He as solicitors and intermediaries; Ariba as the entity designated to collect the $80,000 fee; and the Company as the vehicle through which investor funds were channeled. The Enterprise had an ascertainable structure separate from the pattern of racketeering activity, persisted from at least June 2023 through January 2025, and its activities affected interstate and foreign commerce, including through interstate wire transfers from Massachusetts, banking in California, and lease and franchise payments directed to Tennessee and Colorado.

39. In furtherance of the scheme, Defendants used or caused the use of interstate wires and the mails, including: upon information and belief, the electronic transmission of the Offering Documents, the forged Franchise Agreement, and the February 26, 2024 wire instructions to Plaintiff; upon information and belief, the mailing of the attorney services agreement and the project agreement to Quanmei Zhang in China, received on or about December 20, 2023, and the return mailing of those executed documents from Shanghai, China to the United States by Transition Overseas on or about December 22, 2023; Plaintiff's $800,050.00 wire to the Company's PNC account; upon information and belief, Plaintiff's $80,000 wire to Ariba's East West Bank account; the $200,000 "Singh Bros" wire of February 12, 2024; email communications between Mirza (rick@daulatt.com) and Plaintiff between 2023 and 2024; the $35,000 franchise fee check and $21,222.00 lease deposit check transmitted through the U.S. banking system; the recurring $10,611.00 monthly lease checks to ILC, Inc.; and the mailing or electronic filing of the

Company's 2023 Form 1065 with the IRS.

40. The scheme was also designed to corrupt the immigration process. Defendants structured the Offering Documents to support the filing of a materially false EB-5 petition with USCIS, knowing that no genuine commercial enterprise existed, no jobs would be created, and the franchise agreement was counterfeit, in violation of 18 U.S.C. § 1546. The EB-5 component was not incidental: Plaintiff's primary motivation was lawful permanent residency, and Defendants exploited exactly that.

**CAUSES OF ACTION**

**COUNT I — COMMON LAW FRAUD**

**(Against All Defendants – California Law)**

41. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

42. Under California law, fraud consists of a misrepresentation (false representation, concealment, or nondisclosure, including a promise made without any intention of performing it), knowledge of falsity, intent to induce reliance or defraud, justifiable reliance, and resulting damage. Cal. Civ. Code §§ 1572, 1709, 1710; *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003).

43. In soliciting Plaintiff's investment, and specifically in connection with the Offering Documents executed on or about August 9, 2023 and the Franchise Agreement executed on or about December 13, 2023, Defendants made the following false representations of material fact to Plaintiff, on which Plaintiff relied in wiring $800,050.00 to the Company's PNC account on or about February 27, 2024 and, upon information and belief, $80,000.00 to Ariba: Mirza, using the email address rick@daulatt.com, and He communicated the representations to Plaintiff during the solicitation; Singh executed the Subscription Agreement and Loan Agreement and signed the forged Franchise Agreement as "Owner"; and Patel signed the forged Franchise Agreement as "Operator" on or about December 13, 2023. The specific misrepresentations set forth above included: (a) that the Company held a valid Noodles & Company franchise, a representation made through the forged Franchise Agreement signed by Singh as "Owner" and Patel as "Operator" and,

upon information and belief, provided to Plaintiff through Mirza and He; (b) that the Company would use Plaintiff's funds solely for the Project (Loan Agreement § 2.1); (c) that the Company would create ten full-time jobs within twenty-four months or refund $900,000 (§ 7.2(f)); (d) that the Company would document Project expenditures of not less than $800,000 (§ 5.1(f)) and provide monthly bank statements (§ 4.1(a)); (e) that Ariba would assist Plaintiff in completing the investment and obtaining EB-5 benefits; and (f) that the investment was structured to qualify Plaintiff for EB-5 benefits and an I-526 Petition. Each Defendant knew these representations were false when made, or made them with reckless disregard for their truth.

44. Each representation was material, going to the fundamental legitimacy, viability, and legal compliance of the investment. Defendants made them with intent to induce Plaintiff's investment; Plaintiff justifiably relied; and as a direct and proximate result, Plaintiff suffered damages in an amount to be determined at trial, but not less than $880,000.

**COUNT II — BREACH OF FIDUCIARY DUTY**

**(Against Singh, Mirza, He, and Patel – Wyoming Law)**

45. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

46. Plaintiff acquired a seventy-five percent membership interest in the Company. Under Wyoming law, those managing a limited liability company owe its members duties of loyalty and care, including the duties to account for and hold in trust company property, to refrain from self-dealing and adverse interests, and to act in good faith in the company's best interests. Wyo. Stat. § 17-29-409; *Acorn v. Moncecchi*, 2016 WY 124, ¶¶ 35, 39–40, 386 P.3d 739 (Wyo. 2016); *see also Aimone v. Aimone*, 2023 WY 43 (Wyo. 2023).

47. Upon information and belief, Singh served as the Company's sole managing member. Upon information and belief, Mirza, He, and Patel, though not formally designated managers, assumed and exercised managerial authority—Mirza and He by directing investor communications, facilitating the Offering Documents, and participating in decisions about deploying investor capital; Patel by serving as the designated "Operator" and signing the Franchise Agreement on the Company's behalf.

48. These Defendants breached their fiduciary duties by, among other things, fabricating the Franchise Agreement; misrepresenting the Project's legitimacy and viability; failing to deploy Plaintiff's capital in the Project; failing to create the promised jobs; withholding the required financial reporting; engaging in self-dealing by retaining and misappropriating Plaintiff's capital; and allowing the Company to be dissolved. As a direct and proximate result, Plaintiff suffered damages of not less than $880,000.

**COUNT III — NEGLIGENT MISREPRESENTATION**

**(Against All Defendants — California Law)**

49. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

50. In the alternative to Count I, to the extent any Defendant's conduct is found not to constitute intentional fraud: under California law, one who asserts as a fact that which is not true, without reasonable ground for believing it to be true, with intent to induce another's reliance, is liable for the resulting pecuniary loss caused by the plaintiff's justifiable reliance on that information. Cal. Civ. Code § 1710(2); *Borman v. Brown*, 59 Cal. App. 5th 1048, 1061 (2021).

51. Each Defendant, in the course of business and with a pecuniary interest in the transaction, supplied Plaintiff the false information described above without exercising reasonable care as to its accuracy. Specifically, in the course of soliciting and closing Plaintiff's investment between August 9, 2023 and February 27, 2024, each Defendant supplied Plaintiff false information that the Company held a valid Noodles & Company franchise (through the forged Franchise Agreement signed by Singh as "Owner" and Patel as "Operator"), that Plaintiff's capital would be deployed in a bona fide restaurant project, and that the venture would create ten qualifying jobs—information that, upon information and belief, Mirza (via rick@daulatt.com) and He communicated to Plaintiff, and on which Plaintiff relied in transmitting his funds. Plaintiff justifiably relied, and as a direct and proximate result suffered damages of not less than $880,000.

**COUNT IV — NEGLIGENCE**

**(Against All Defendants — California Law)**

52. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth

herein.

53. Defendants owed Plaintiff, as an investor and member of the Company, a duty of reasonable care in managing the Company's affairs, deploying his capital, making accurate representations, and administering the investment in compliance with law and the Offering Documents. Defendants breached that duty by, among other things, failing to verify that the Franchise Agreement was genuine before presenting it to Plaintiff; failing to deploy his capital in the Project or create the promised jobs; failing to provide required financial reporting; failing to maintain the Company in good standing; failing to investigate ILC, Inc.'s corporate history; and failing to disclose the Company's lack of operating history and financial condition. As a direct and proximate result, Plaintiff suffered damages of not less than $880,000.

**COUNT V — RESCISSION UNDER SECTION 29(b) OF THE SECURITIES EXCHANGE ACT OF 1934**

**(Against Lawrenceburg Noodles LLC, Singh, and Ariba)**

54. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

55. The membership interests sold to Plaintiff are "securities" under Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10): they were investment contracts in a common enterprise with profits to be derived solely from the efforts of the Defendants who managed the Company.

56. Section 29(b), 15 U.S.C. § 78cc(b), voids every contract made in violation of the Exchange Act and every contract whose performance involves such a violation. The Subscription Agreement, Loan Agreement, and Fee Agreement were made in connection with the fraudulent offer and sale of securities in violation of the Exchange Act's anti-fraud provisions, and their performance involved continuing violations, as Defendants used the contracts as instrumentalities to induce and misappropriate Plaintiff's investment.

57. Plaintiff had no actual knowledge of the facts rendering these contracts unlawful at the time of the transactions. He is entitled to rescission of all three agreements and the return of all amounts paid thereunder—$800,050.00 paid to the Company and, upon information and belief,

$80,000 paid to Ariba—plus interest.

**COUNT VI — RESCISSION OF CONTRACTS**

**(Against Lawrenceburg Noodles LLC, Singh, and Ariba — California and Wyoming Law)**

58. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

59. The Subscription Agreement and Fee Agreement were procured by the fraud alleged herein, and Plaintiff would not have entered into them but for Defendants' misrepresentations. Under California law, a party whose consent to a contract was obtained through fraud may rescind the contract upon prompt notice of rescission and restoration, or an offer to restore, of any benefits received. Cal. Civ. Code §§ 1689, 1691. The Loan Agreement, which is governed by Wyoming law (§ 8.11), was likewise procured by the fraud alleged herein and is voidable at Plaintiff's election under Wyoming law. Plaintiff elects to rescind all three agreements and demands the return of all amounts paid—$800,050.00 to the Company and, upon information and belief, $80,000 to Ariba—plus the $100,000 job-creation failure penalty provided in the Loan Agreement.

**COUNT VII — VIOLATION OF THE CALIFORNIA CORPORATE SECURITIES LAW OF 1968**

**(Against All Defendants)**

60. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

61. The California Corporate Securities Law of 1968 makes it unlawful for any person to offer or sell a security by means of a written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Cal. Corp. Code § 25401. Any person who violates Section 25401 is liable to the purchaser, who may sue for rescission or damages, unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission, or that the defendant exercised reasonable care and did not know of the untruth or omission. Cal. Corp. Code § 25501.

62. The membership interests sold to Plaintiff, as alleged above, were securities. Defendants offered and sold those securities to Plaintiff by means of the Offering Documents and the forged Franchise Agreement, which contained untrue statements of material fact and omitted material facts necessary to make the statements made not misleading, including that the Company held a valid, twenty-year Noodles & Company franchise it did not hold—a representation made through the forged Franchise Agreement, signed by Singh as "Owner" and Patel as "Operator," and, upon information and belief, conveyed to Plaintiff by Mirza (rick@daulatt.com) and He—on which Plaintiff relied in wiring $800,050.00 to the Company on or about February 27, 2024 and, upon information and belief, paying the $80,000 Ariba fee. Defendants cannot establish that Plaintiff knew the facts concerning the untruth, or that Defendants exercised reasonable care and did not know of the untruth. As a direct and proximate result, Plaintiff suffered damages of not less than $880,000. Plaintiff elects to sue for rescission of his purchase of the membership interests, or in the alternative, damages, and is entitled to reasonable attorneys' fees and costs pursuant to Cal. Corp. Code § 25501.

**COUNT VIII — CIVIL RICO, 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

63. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

64. Section 1962(c) makes it unlawful for any person employed by or associated with an enterprise affecting interstate commerce to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. A civil RICO claim requires two or more predicate offenses, an enterprise affecting interstate commerce, a connection between the predicates and the enterprise, and injury by reason of the violation. *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 593 (6th Cir. 2022).

65. As alleged above, Defendants constituted an association-in-fact Enterprise with a common purpose, defined roles, ongoing relationships among its members, and longevity sufficient to pursue its purpose from at least June 2023 through January 2025. The Enterprise was distinct from the pattern of racketeering activity: its structure, roles, and relationships existed to

conduct the scheme, of which the predicate acts were the means. Its activities affected interstate and foreign commerce.

66. **Mail fraud (18 U.S.C. § 1341).** Mail fraud requires a scheme to defraud, use of the mails in furtherance of the scheme, and intent to deprive a victim of money or property; any mailing incident to an essential part of the scheme satisfies the mailing element, and reliance is not required. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648–49 (2008); *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). Defendants committed multiple acts of mail fraud, including: upon information and belief, the mailing of the attorney services agreement and the project agreement to Plaintiff's mother, Quanmei Zhang, in China, received on or about December 20, 2023, and the mailing of those executed documents from Shanghai, China to the United States on or about December 22, 2023, each constituting the deposit and receipt of matter sent or delivered by mail or by private or commercial interstate carrier in furtherance of the scheme; the transmission of the $35,000 franchise fee check and $21,222.00 lease deposit check; the Company's recurring monthly lease checks of $10,611.00 to ILC, Inc.; and the filing of the Company's 2023 Form 1065 with the IRS. Each mailing was incident to an essential part of the scheme.

67. **Wire fraud (18 U.S.C. § 1343).** Defendants committed multiple acts of wire fraud, including: upon information and belief, the electronic mail transmission of the Offering Documents to Plaintiff by Mirza (using the email address rick@daulatt.com) on or about August 9, 2023; upon information and belief, the electronic mail transmission of the forged Franchise Agreement to Plaintiff by Singh and/or Patel on or about December 13, 2023; the interstate wire of $800,050.00 from Plaintiff's account to the Company's PNC account; upon information and belief, the interstate wire of $80,000 from Plaintiff to Ariba's East West Bank account; the $200,000 "Singh Bros" wire of February 12, 2024; the electronic transmission of the Offering Documents and wire instructions to Plaintiff; and email communications between Mirza and Plaintiff in furtherance of the scheme.

68. **Transportation of fraudulently obtained funds (18 U.S.C. §§ 2314–2315).** Defendants obtained Plaintiff's $800,000 capital investment, wired as $800,050.00, and, upon

information and belief, the $80,000 Ariba fee, by fraud and caused those funds, exceeding $5,000 in value, to be transported in interstate commerce among Massachusetts, California, and Tennessee, knowing the funds had been obtained by fraud.

69. **Immigration document fraud (18 U.S.C. § 1546).** Defendants knowingly created sham documentation—including the Franchise Agreement, the Lease Agreement, and supporting business records—designed to support the filing of materially false EB-5 petitions with USCIS representing that the documented business existed and would create qualifying employment under 8 U.S.C. § 1153(b)(5). These acts were committed for financial gain, namely the receipt and retention of Plaintiff's $800,000 capital investment, wired as $800,050.00, and, upon information and belief, the $80,000 Ariba fee, and qualify as racketeering activity under 18 U.S.C. § 1961(1)(B).

70. These predicate acts constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5). They are related—sharing common purposes, participants, victims, and methods—and continuous, spanning at least June 2023 through January 2025 across multiple transactions and, upon information and belief, forming part of an ongoing operation that may have victimized other foreign investors.

71. As a direct and proximate result of Defendants' violation of § 1962(c), Plaintiff was injured in his property: the investment capital he transferred in reliance on Defendants' representations was misappropriated and dissipated. Plaintiff's damages are not less than $880,000, and he is entitled to treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT IX — CIVIL RICO CONSPIRACY, 18 U.S.C. § 1962(d)**

**(Against All Defendants)**

72. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

73. Each Defendant knowingly agreed to participate in the conduct of the Enterprise's affairs through the pattern of racketeering activity alleged above, in violation of 18 U.S.C. § 1962(d). The agreement is evidenced by the division of roles among Defendants; the preparation

and execution of interlocking documents—the Franchise Agreement, Lease Agreement, and Loan Agreement—each referencing the same Tennessee project and requiring coordinated action; the coordinated representations made to Plaintiff; the creation and prompt dissolution of the entity Defendants in a pattern consistent with concealment; and the misappropriation of Plaintiff's capital, which, upon information and belief, required coordination among persons with access to the receiving accounts. Each Defendant knew the essential nature and scope of the scheme and agreed that its objectives would be accomplished through the pattern of racketeering activity alleged herein.

74. As a direct and proximate result, Plaintiff was injured in his property in an amount not less than $880,000 and is entitled to treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**PUNITIVE DAMAGES**

75. Defendants' conduct was intentional, fraudulent, malicious, and reckless. They knowingly devised and executed a scheme to take investment funds under the false pretense of building a franchise restaurant and creating qualifying employment, with no intention or capacity to perform, and they directed that scheme at investors seeking lawful pathways to permanent residency—a class whose vulnerability Defendants understood and exploited. Plaintiff is entitled to punitive damages against each Defendant, jointly and severally, in an amount to be determined by the trier of fact sufficient to punish Defendants and deter similar misconduct, upon a showing by clear and convincing evidence of oppression, fraud, or malice. *See* Cal. Civ. Code § 3294 (authorizing punitive damages upon clear and convincing evidence of oppression, fraud, or malice).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kenneth Hu respectfully prays for judgment against Defendants, jointly and severally, as follows:

(a) On Counts I through IV (Fraud, Breach of Fiduciary Duty, Negligent Misrepresentation, and Negligence): compensatory damages in an amount to be determined at trial, but not less than $880,000, together with disgorgement of profits and an accounting on Count II;

(b) On Counts V and VI (Rescission): rescission of the Subscription Agreement, the Loan Agreement, and the Fee Agreement, and the return of all amounts paid thereunder—$800,050.00 paid to Lawrenceburg Noodles LLC and, upon information and belief, $80,000 paid to Ariba Holding LLC—plus, on Count VI, the $100,000 job-creation failure penalty;

(c) On Count VII (California Corporate Securities Law of 1968): rescission of Plaintiff's purchase of the membership interests, or in the alternative, damages, and reasonable attorneys' fees and costs pursuant to Cal. Corp. Code § 25501;

(d) On Counts VIII and IX (Civil RICO): treble damages, costs of suit, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

(e) An order imposing an equitable lien and constructive trust on all funds and property obtained by Defendants through the scheme, and an accounting of all funds received and disbursed in connection with it;

(f) Punitive damages of not less than $2,700,000;

(g) Pre-judgment and post-judgment interest at the maximum rate permitted by law, and attorneys' fees and costs of suit to the extent permitted by law; and

(h) Such other and further relief as the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: August 14, 2026

**LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**

*/s/ Hadjar Anahita Ohadi*
Hadjar Anahita Ohadi

*Attorneys for Plaintiff Kenneth Hu a/k/a Yangming Hu*